1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF CALIFORNIA
2                   --oOo--

3   UNITED STATES OF AMERICA,    ) Docket No. 22-CR-70
                                 ) Sacramento, California
4                   Plaintiff,   ) September 19, 2022
                                 ) 9:06 a.m.
5             v.                 )
                                 )
6   SHERRI PAPINI,               ) Re: Judgment and sentence
                                 )
7                   Defendant.   )

8
                    TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE WILLIAM B. SHUBB
           SENIOR UNITED STATES DISTRICT JUDGE
10
    APPEARANCES:
11
    For the Plaintiff:     UNITED STATES DEPARTMENT OF JUSTICE by
12                         MS. VERONICA ALEGRIA
                           MS. SHELLEY WEGER
13                         Assistant U.S. Attorneys
                           501 I Street, Suite 10-100
14                         Sacramento, CA 95814

15  For the Defendant:     LAW OFFICE OF WILLIAM J. PORTANOVA
                           MR. WILLIAM JOHN PORTANOVA
16                         400 Capitol Mall, Suite 1100
                           Sacramento, CA 95814
17

18              JENNIFER COULTHARD, RMR, CRR
                   Official Court Reporter
19                501 I Street, Suite 4-200
                   Sacramento, CA 95814
20                jenrmrcrr2@gmail.com
                     (530)537-9312
21
    Proceedings reported via mechanical steno - transcript produced
22  via computer-aided transcription

23

24

25

        JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    SACRAMENTO, CALIFORNIA, MONDAY, SEPTEMBER 19, 2022

2                        --oOo--

3        (In open court.)

4            THE CLERK:  Case criminal 22-70, the United States v.

5    Sherri Papini.

6            Counsel, please state your appearances.

7            MS. ALEGRIA:  Good morning, Your Honor; Veronica

8    Alegria and Shelley Weger on behalf of the United States.

9            MR. PORTANOVA:  And good morning, Your Honor; William

10   Portanova on behalf of Ms. Papini, who is present.

11           THE COURT:  This matter is on today for judgment and

12   sentence.

13           The Court has received the final presentence report

14   from the probation officer, which was made available on August

15   the 8th of this year and revised for the second time on

16   September the 8th.

17           Mr. Portanova, have you received and read a copy of

18   the final presentence report?

19           MR. PORTANOVA:  I have, Your Honor.

20           THE COURT:  And have you discussed it fully with

21   Ms. Papini?

22           MR. PORTANOVA:  Yes, Your Honor.

23           THE COURT:  Ms. Papini, have you received and read a

24   copy of the final presentence report?

25           THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  Have you discussed it with Mr. Portanova?

2        THE DEFENDANT:  Yes, Your Honor.

3        THE COURT:  Ms. Weger or Ms. Alegria, has the

4    government received a copy of this report?

5        MS. ALEGRIA:  Yes, Your Honor.

6        THE COURT:  Looking first to the sentencing

7    guidelines, Mr. Portanova, do you have any objections to the

8    findings of the presentence report with respect to the

9    calculation of the sentencing guidelines?

10        MR. PORTANOVA:  No, Your Honor.

11        THE COURT:  Does the government have any objections?

12        MS. ALEGRIA:  No, Your Honor.

13        THE COURT:  Very well.  Then there being no objections

14    to the findings of the presentence report, the Court adopts

15    those findings and determines them to be true and correct.

16    Accordingly, the Court finds that the applicable offense level

17    is 11, and the criminal history category is 1.

18        Now, Mr. Portanova, I'd like to hear what you have to

19    say with regard to the sentence to be imposed.  This case is

20    unique, to say the least, and there are a few precedents that

21    the Court can look to as guidance.

22        I have considered the sentencing guidelines, and of

23    course the Court is not bound by the guidelines.  The Court may

24    impose a sentence within the guidelines, above the guidelines

25    or below the guidelines.

1      I need to consider all of the relevant sentencing

2    factors in section 3553(a) of Title 18, and I would appreciate

3    any comments, suggestions, remarks and arguments you might have

4    with respect to those factors.

5           MR. PORTANOVA:   Thank you, Your Honor.

6           Sherri Papini does present a unique case for our

7    office and perhaps for the Court or one of the unique cases the

8    Court has experience with.

9           We have a crime and a series of crimes and coverups of

10   the crime, took place many years ago, that was clearly the

11   product at that time of a disturbed mind.  We do not make

12   mental health defense excuses here, Your Honor.  We are simply

13   reporting the facts as we have learned them over the course of

14   the past six months of a fairly intense relationship with

15   Ms. Papini and my office.

16          There is no question that at the time she committed

17   these offenses, she was living in a world of denial, a

18   conflicting world of competing interests, a world that had been

19   spun for her by whatever she did in her early years and

20   whatever other people did to her.  That doesn't make her

21   unique, of course, but in this case it had unique consequences.

22          There's no question that she is today the person that

23   she is supposed to be.

24          She has -- I have never had a client demand that I be

25   so brutally frank in the sentencing memorandum as I have with

1    Ms. Papini.

2    She wants nothing to do with the person that she had

3    allowed herself to become through her own craziness and

4    selfishness, and today she stands as if she has passed through

5    a shattered glass and is a new person.

6    Her overwhelming sense of guilt for what she's done to

7    her family, to her children in particular, and the waste of

8    time that she created for law enforcement and the people of

9    Northern California and the good people who care about real

10   kidnap victims tears at her constantly.

11   When she was in the middle of her lie, she continued

12   to see a psychologist or licensed clinical social worker for

13   the entire 5 years, 250 visits, and never came close to

14   approaching what her real problem was.

15   Not until she was painted into a corner by the good

16   work of the FBI and the Shasta County District Attorney's

17   Office facing this case head-on and sitting in our office did

18   she become forced to accept the insanity of what she had done,

19   the nonsense of the denial, and she had to admit the fact that

20   what she had done, as painful as it was to admit, really did

21   include her leaving her family and her children, who are the

22   most important things in the world to her, there's no doubt

23   about it, but she did this.  She left.  She was gone for three

24   weeks.  She disassembled and lied when she returned, and then

25   she kept it going the entire time until forced to change her

1    mind.

2              THE COURT:  The government makes the statement in its

3    sentencing memorandum that she continued to assert that she had

4    been kidnapped even after the time that you are telling us that

5    she faced up to reality with you, the probation officer and the

6    Court.  Would you like to comment on that?

7              MR. PORTANOVA:  I have seen a letter or two that was

8    presented by people who have their own gripes with Ms. Papini

9    who make that claim.  To me it is gossip.  I don't have any

10   proof that that is actually happening.

11             But I will also say this:  To the extent that Sherri

12   Papini has not found it necessary to explain her entire

13   psychological breakdown and what she's done and how she's

14   coming to terms with the fact that she abandoned the one thing

15   in her life that she loved, and to the extent that she did a

16   180-degree turn on a Sunday afternoon in my office just before

17   court --

18             THE COURT:  She did a 180-degree turn when?

19             MR. PORTANOVA:  When she admitted the truthfulness of

20   the allegations against her.

21             THE COURT:  When was that?

22             MR. PORTANOVA:  Before she pled guilty, Your Honor.

23             THE COURT:  The report seems to indicate that she was

24   telling Dr. Forester within four days before the date that she

25   appeared in this court that she was kidnapped.

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1          MR. PORTANOVA:  I spoke with Dr. Forester.  I told

2     Sherri not to waste his time -- her time going back and trying

3     to correct the record with her; that she had not, in my

4     opinion, helped Sherri Papini achieve any breakthrough in 255

5     visits and that I recommended she get a different doctor.

6          And Sherri Papini asked me "Should I explain

7     everything to Dr. Forester"?

8          And I said, "No.  Work on the future."

9          The fact that Dr. Forester, after having been relieved

10    of her responsibilities, somehow chose to do a post-treatment

11    different analysis than what she had said over the course of

12    five years, I cannot -- I can't defend it, and I don't

13    understand why she did it.

14         THE COURT:  I'm not sure I understand what you're

15    saying.  Are you saying she did not tell Dr. Forester four days

16    before she appeared in this court that she had been kidnapped?

17         MR. PORTANOVA:  When she -- she had appointments with

18    Dr. Forester every week.  When she was in my office and she

19    agreed with me that it is time to simply admit that it was all

20    a lie, she fired Dr. Forester and chose not to engage her

21    further and let Dr. Forester live with whatever thoughts she

22    had.

23         No one ever thought a doctor, a psychiatrist, an LCSW,

24    would write a cruel letter expressing her anger after she had

25    been relieved from treating her.  She has no place in this

1    courtroom.

2             Dr. Diggs, himself, who she started treating with

3    immediately, approached it from a position of truth.  And his

4    letter shows five and six months of her hard work on honesty.

5             But in 255 visits, Dr. Forester achieved exactly zero

6    breakthroughs with Sherri Papini.

7             THE COURT:  Yes, but that's because Ms. Papini was not

8    telling Dr. Forester the truth, right?

9             MR. PORTANOVA:  That's 100 percent true, Your Honor,

10   but the question of the Court was whether or not she was

11   telling people after her plea that she had not -- that she had,

12   in fact, been kidnapped.  And I'm here to report to the Court

13   that that changed completely days before the plea.

14            She pled guilty in open court, she pled guilty under

15   oath, and she admitted the facts and told the world --

16            THE COURT:  But it's not the date that she pled

17   guilty.

18            When did you enter into the plea agreement; not the

19   day that she pled guilty?

20            MR. PORTANOVA:  No.

21            THE COURT:  How long before she pled guilty did you

22   enter into the plea agreement?

23            MR. PORTANOVA:  It was the Sunday before.  So several

24   days.

25            THE COURT:  Several days.  So just to be clear, are

1    you telling me that she did not tell anyone after she entered

2    the plea agreement that she had been kidnapped?

3            MR. PORTANOVA:  I can't say that, Your Honor, because

4    everybody in the world was peppering her with questions, and I

5    don't think it was her responsibility to add fuel to the media

6    firestorm of explaining to them the intense psychological

7    process she went through to get to the point where she admitted

8    her guilt.

9            THE COURT:  All right.

10           MR. PORTANOVA:  I advised her not to tell anybody

11   anything, and it's my opinion she didn't.

12           And if you read the letters from her family and

13   supporters, they say that.  And they all demonstrate proof that

14   over this last six months, she has done nothing but admit her

15   guilt and try to move forward.

16           And our sentencing memorandum could not have made that

17   more clear.  I've never had a client with such a sentencing

18   memorandum being so clear about her acceptance of guilt.

19           THE COURT:  All right.  Go ahead.

20           MR. PORTANOVA:  So to the extent that somebody may say

21   otherwise, I'm sure everybody has an opinion on everything, but

22   it doesn't make it admissible or relevant or even true.

23           Now, ordinarily in a situation where I have a young

24   mother who's facing jail time, I would say to the Court, let's

25   have sympathy for Ms. Papini because she has children.  I can't

1    say that here because those are the same children she abandoned
2    in that three-week period.

3            I could say she's a loving mother and homeschooled and
4    does all sorts of wonderful things for her family and is loved
5    by the people that are close to her, but these are the same
6    people that she rejected and terrified by her scheme.

7            So today she stands here as somebody literally
8    exposing her entire soul for the Court and the press, all of
9    whom are paying attention, to this broken woman who did a
10   terrible thing to herself, to her family, to the community.
11   And all she has done since we have been brought on board to
12   help her is admit her guilt and work on her future.

13           She is without her children.  The family court
14   proceedings were dominated by her husband for the last six
15   months, which we understand and accept the rationale behind
16   that.  That is going to be a long and intense process.

17           Her recovery is a long and intense process, but I
18   think her recovery can be demonstrated through any testimony we
19   might seek from pretrial services or the probation office or
20   the woman she lives with who's here in court.

21           Sherri Papini is a different person today.  Doesn't
22   mean she doesn't get punished.  Doesn't mean we have to forgive
23   her.  But, to the extent that a false claim like this has a
24   very negative effect on everything everywhere, from law
25   enforcement to community trust, we get it.  She's pleading to

1  felonies.  We get that.  And she needs to be punished.  We

2  understand that as well.

3       My position is simply that the amount of punishment

4  that she receives is probably going to pale compared to the

5  punishment she feels every minute.  All the people that we

6  walked past on the way into the courtroom today, everybody that

7  she sees in public, everyone knows what's happened here.  She

8  knows it.  She knows that she did that to people, and she knows

9  she has no excuse.  That's never going away.

10       Time in jail is required, of course, by most judges in

11  most felony cases.  I wasn't going to argue to give her no

12  time, Your Honor, because I recognize the deterrent effect the

13  Court seeks to impose, share with the country.  But the truth

14  is, she does not need much custody time in order to underline

15  the message that she has received and that she has accepted and

16  that she has shared openly with everybody in her life; maybe

17  not the people she doesn't trust.  Maybe the people she doesn't

18  like she did not open her soul to and tell them everything, but

19  she certainly told us.  She certainly told the Court.  She

20  certainly told Dr. Diggs.  And she certainly put it in her

21  sentencing memorandum.

22       THE COURT:  You mentioned testimony.  It was not the

23  Court's understanding that anybody intended to call witnesses.

24  Do you want to call witnesses this morning?

25       MR. PORTANOVA:  No, Your Honor.

1          THE COURT:  All right.

2          I wanted to ask you about restitution.  Part of the

3    proposed judgment is that Ms. Papini make restitution.  Is

4    there any realistic possibility that she's going to be able to

5    make restitution?

6          MR. PORTANOVA:  This is not -- not in the position

7    that she's in now.

8          There is, of course, public interest in this, but I

9    can accurately and honestly report to the Court that we have

10   accepted and pursued nothing in terms of anyone's interest in

11   her story.  We don't think it's relevant, and I'm not going to

12   be involved in it.

13         So to the extent that there may be some value at some

14   point in the future, then I suppose there is a chance that she

15   could make restitution, but I have -- as she stands here today,

16   she's broke, as the reports in her family law case make clear.

17   Her husband owns 100 percent of everything, always has, and has

18   a prenuptial agreement guaranteeing that he owns a hundred

19   percent of everything going back years.  She literally has

20   nothing.  She stays with her sister-in-law.

21         And, you know, the reason I'm not arguing that she has

22   zero chance at restitution is because she's a young woman.  She

23   can work.  She can make payments.  There's no question about

24   that.

25         The amount of money involved here may or may not be

1   met, but once this case is finished, she will be able to be

2   released into the working world again and perhaps make some

3   substantial payments, but I -- we have nothing to base that on.

4   She has been a mother at home for the last five, six years.

5   Before that, she was an account executive with the telephone

6   company, brief period of time.  And to the extent that she

7   needs now to choose a new life and a new career alone, it is a

8   question mark.

9          THE COURT:  Before I call upon Ms. Papini, Ms. Weger

10  or Ms. Alegria, is there anything would you like to say on

11  behalf of the government?

12         MS. ALEGRIA:  Yes, Your Honor.  Thank you.

13         Your Honor, defense has articulated that Ms. Papini is

14  a different person today.  And while the government hopes that

15  that is true, the government implores Your Honor to look to the

16  history of this case.

17         Ms. Papini is a skillful liar and manipulator.  She

18  maintained her lies for years.  She fooled her family, her

19  closest friends, a therapist, law enforcement officers.  At

20  this point she would say and do anything to mitigate her

21  punishment.  And I think Your Honor rightly pointed out that

22  there seemed to be some differences of opinions and some

23  statements that illustrate that she has been weaving various

24  stories in order to get the most benefit.

25         Your Honor, the government recommends eight months of

1    imprisonment, a low-end sentence of the guidelines; not home

2    confinement but imprisonment because, Your Honor, this

3    defendant -- for this defendant we believe home confinement

4    would not be very much punishment because, as her history

5    shows, she voluntarily almost confined herself during the 22

6    days that she was missing.  And then after she returned, she

7    pretty much stayed at home.

8            This case is serious and there have been real harms to

9    society.  There was the community that came together during

10    those 22 days and volunteered immeasurable time to search for

11    her and almost $50,000 in aid of her recovery.

12            And then when she returned and spoke about Hispanic

13    women abducting her in broad daylight at gunpoint, there was a

14    community that lived in fear, that wouldn't go out jogging,

15    that was afraid of being abducted similarly, especially when

16    these two fictional Hispanic women could not be found.

17            And then there was the Hispanic community that were

18    the victims of many tips to law enforcement that they were

19    actually perpetrators in this fictional crime.

20            And, Your Honor, Ms. Papini took funding from real

21    victims, from the California Victim Compensation Board, and

22    when she caused law enforcement agencies --

23            THE COURT:  Can I ask you about that?

24            You've said in your brief that she took the funding

25    from real victims and you've said it here today.  Is that from

1  a state fund, or does that actually come from others?

2          MS. ALEGRIA:  It's a state fund, Your Honor.

3          THE COURT:  So she took money really from the State?

4          MS. ALEGRIA:  She took money from the State that would

5  otherwise have been used for real victims, Your Honor.

6          THE COURT:  All right.  Is it a limited fund that can

7  only be limited to a certain extent?

8          MS. ALEGRIA:  Your Honor, I believe this fund is

9  funded through crimes paid by criminals.  I don't know for

10 sure.

11         THE COURT:  All right.  So the amount of the fund may

12 be limited, but you're not sure?

13         MS. ALEGRIA:  Yes, Your Honor.

14         THE COURT:  What about the Go Fund Me, is there any

15 chance that those people will get that money back?

16         MS. ALEGRIA:  I don't believe so, Your Honor.

17         THE COURT:  Go ahead.

18         MS. ALEGRIA:  There are -- in general, victims of

19 crimes may now fear that they won't be believed by law

20 enforcement because of this hoax and the notoriety of her false

21 claims.

22         So, Your Honor, this case is serious and we believe

23 that it is not the product of a disturbed mind or someone in

24 denial, but it was the product of someone who began planning it

25 since as early as December of 2015, almost a year before she

1    actually went missing.  And because of that, a just sentence

2    would be eight months in prison.

3           THE COURT:  All right.  Ms. Papini, this is your

4    opportunity.  What would you like to tell the Court before I

5    pronounce sentence?

6           MR. PORTANOVA:  She has a statement that she's

7    written, Your Honor.

8           THE DEFENDANT:  Your Honor, I stand before you humbled

9    by this Court, truly honored and grateful you're allowing me to

10   speak.

11          I'm so sorry to the many people who have suffered

12   because of me, the people who have sacrificed for the broken

13   woman that I was, the people who gave willingly to help me at a

14   time that I so desperately needed help.  I thank you all.

15          I thank the government for allowing me this

16   opportunity for this plea agreement.

17          I thank my attorney team for fighting for me.

18          And I thank the many people who are still willing to

19   help me on my long road ahead.

20          And I thank you, Your Honor.  You've seen so much

21   dishonor laid before you here in this room, people who are not

22   willing to walk through the shame and say that they are guilty.

23          I am not one of them.  I am guilty, Your Honor.  I am

24   guilty of lying, I am guilty of dishonor, and I stand before

25   you willing to accept, to repent and to concede.

1          I trust in this court.  I trust in the officers

2     handling my release and I trust in you, Your Honor, to see me,

3     to hear me.

4          What was done cannot be undone.  It cannot erased.  I

5     am not choosing to stay frozen like I was in 2016.  I am

6     choosing to commit to healing the parts of myself that were so

7     very broken, and I am choosing to humbly accept all

8     responsibility.  Thank you sincerely.  Thank you.

9          THE COURT:  The Court is ready to rule.

10         As I have said, the Court must consider the sentencing

11    guidelines, and I do.  The Court considers the recommendation

12    of the United States Attorney and the recommendation of the

13    probation officer in this matter, as well as Mr. Portanova's

14    request.

15         As indicated, the Court is not bound by the

16    guidelines.  I have a number of other factors that I must

17    consider.  And to be entirely candid, I believe Ms. Papini

18    needs to serve a longer prison term than that recommended

19    either by the probation officer or by the government.

20         Among the factors that the Court must consider are the

21    seriousness of the offense and the need to deter others who

22    might consider similar conduct.  And I don't believe either one

23    month or eight months in jail are sufficient to satisfy those

24    needs.

25         The seriousness of the offense is exemplified by what

1   the government has set forth in its sentencing memorandum and

2   here in court.

3            Just the sheer numbers of people that were impacted by

4   Ms. Papini's conduct, the officers that took their time away

5   from other victims to investigate this case, the other victims

6   of other crimes that had their cases ignored or put on the back

7   burner while Ms. Papini's case was investigated, all of the

8   members of the community who lived in fear of the presence of

9   two Hispanic women that might kidnap them, those who helped

10  look for Ms. Papini while she was missing, and not the least,

11  her family and friends who, for those three weeks, believed she

12  had been kidnapped and may not ever return and then for the

13  next four years believed her story.  All those people have been

14  impacted.

15           People don't like to be conned.  And I doubt that most

16  of those people who were deceived would believe that one month

17  or eight months in jail is an adequate punishment for this

18  offense.

19           The seriousness of the offense is also exemplified by

20  the amount of loss that the government has pointed out, the

21  amounts paid by the California Victims Assistance Fund, the

22  Social Security Administration and the time expended by not

23  just Shasta County officials but the FBI.

24           And then finally, there's that $49,000 that people

25  contributed to the Go Fund Me account under those fraudulent

1    representations that were made by Ms. Papini.  They thought she

2    had been kidnapped.  Out of the generousness of their hearts,

3    they gave their hard-earned money for her and her family to

4    help them based upon that lie, and that money will never be

5    returned.

6          Now, I know the probation officer has recommended

7    restitution, and it's part of the law that the Court must

8    impose restitution, but let's be realistic about it.  That

9    restitution is never going to be paid.  Some $300,000 that

10   she's going to be ordered to pay will never be paid, not unless

11   she wins the lottery.

12         She has hopes of gaining employment.  I would ask

13   rhetorically who's going to employ Ms. Papini in the future?

14   And I doubt that the victims who have been defrauded out of

15   that money would feel that eight months in jail is anywhere

16   near equivalent to the loss that they have incurred.  And so I

17   think a greater sentence than that recommended is required.

18         I have given a lot of thought to what that might be.

19   And I believe that the sentence I'm going to impose is the one

20   that is sufficient but not greater than necessary to accomplish

21   all of the relevant sentencing purposes.

22         I noted that the government stated in its memorandum

23   that the nation is watching this proceeding.  I'm not sure the

24   entire nation is watching, but to the extent that people are

25   watching this proceeding, I think they need to be sent the

1    right message.

2            I've mentioned deterring others from committing

3    similar crimes.  I like to think it isn't so, but there maybe

4    some copycat or copycats out there that might consider

5    something similar to what Ms. Papini did, maybe to gain

6    sympathy from their friends and relatives or the community,

7    maybe to gain some notoriety, maybe even to gain some profit.

8    After all, just look at the Go Fund Me account that has over

9    $49,000 in it.  Someone may think:  I can do the same.  If I

10   get away with it, I'll have $49,000.  If I don't get away with

11   it, I'll spend maybe a month, eight months in jail.  If I spend

12   a month, that's $49,000 a month.  That's a pretty good profit.

13   If I spend eight months, that's still about $6,000 a month as I

14   calculate it.  And we have to make sure that crime does not

15   pay.  And I don't want to impose a sentence that will cause

16   anybody to think if they did the same thing or similar to what

17   Ms. Papini did, the crime may pay for them.  So that's a

18   consideration that we have to take into account.

19           And I have taken into account Ms. Papini's childhood.

20   That's in the presentence report.  It's discussed.  It was not

21   good.  But compared to many others that we've seen, it's not

22   that remarkable.  Yes, her parents had a drinking problem, they

23   argued, but there's no evidence she was abused physically or

24   sexually.  There is a reference to being pulled by the hair.

25   But other than her own statements, there's nothing to suggest

1   that it was that extreme.  To that extent, her upbringing may

2   be overstated.

3           You've alluded to Dr. Diggs' report.  I know the

4   probation officer considered it carefully.  But as the

5   government points out, Ms. Papini's a manipulator and now that

6   she's got Dr. Diggs, I think she's making every effort to

7   manipulate Dr. Diggs as she did Dr. Forester, as she attempted

8   do with the probation officer and, quite frankly, what she

9   attempts to do with the Court.

10          Dr. Forester saw her over 300 times and believed her

11  story, that she had been kidnapped.

12          Dr. Diggs, likewise, has to rely upon what Ms. Papini

13  tells to Dr. Diggs.  And finally, I just wanted to say it's not

14  as if Ms. Papini has seen the error in her ways and decided to

15  fess up.  Her hoax was uncovered only by the diligent detective

16  work of the Shasta County officials and the FBI, including DNA

17  and interviews, physical evidence and old fashioned legwork.

18  It was not because she decided to come forward and admit to her

19  wrongdoing.  And I'm convinced that if she had not been caught

20  that she'd still be living the lie.  She'd still be telling

21  everybody how she was kidnapped, and she'd still be taking the

22  money that people were contributing to her.

23          So with all of that in mind, pursuant to the

24  Sentencing Reform Act of 1984, it is the judgment of the Court

25  that the defendant is hereby committed to the custody of the

1  Bureau of Prisons to be imprisoned for a term of 18 months on
2  each of Counts 3 and 35 to be served concurrently for a total
3  term of 18 months.

4      The defendant shall pay a special penalty assessment
5  of $200, payment to begin immediately.

6      The Court finds that Ms. Papini does not have the
7  ability to pay a fine, and, therefore, the imposition of a fine
8  is waived.

9      It is further ordered the defendant shall pay
10  restitution to the victims in the amount of $309,902.23, as
11  outlined in the restitution attachment to the presentence
12  report, payment to begin immediately.

13      The interest on the restitution and special penalty
14  assessment is waived.  The restitution shall be sent to the
15  Clerk of the Court, who will forward it to the victims.

16      Payment of any unpaid criminal monetary penalty in
17  this case is due during the term of imprisonment at the rate of
18  10 percent of the defendant's gross income per month or $25 per
19  quarter, whichever is greater.

20      The payment shall be made through the Bureau of
21  Prisons Inmate Financial Responsibility Program.

22      Upon release, the defendant shall be placed on
23  supervised release for a term of 36 months.  I know the
24  probation officer recommended 24.  I am imposing 36 months of
25  supervised release on Counts 3 and 35 to be served concurrently

1    for a total term of 36 months supervised release.

2          Within 72 hours of release from the custody of the

3    Bureau of Prisons, the defendant shall report, in person, to

4    the probation office in the district to which she is released.

5          While on supervised release, the defendant shall not

6    commit another federal, state or local crime and shall not

7    illegally possess controlled substances.

8          She shall make restitution in accordance with the

9    provision of section 3663 and 3663(a) of Title 18 United States

10   Code or any other statute authorizing a sentence of

11   restitution.

12         The defendant shall cooperate in the collection of

13   DNA, as directed by the probation officer, and shall comply

14   with the standard conditions, which have been recommended by

15   the United States Sentencing Commission and adopted by this

16   Court.

17         The Court will suspend the mandatory drug testing

18   condition based upon its determination that Ms. Papini poses a

19   low risk of future substance abuse.

20         The defendant shall also comply with the following

21   special conditions:  First, she shall submit to the search of

22   her person, property, home and vehicle by a United States

23   Probation Officer or any other authorized person to commit --

24   to perform searches.  She shall cooperate in the search of any

25   electronic communications data, storage devices or media or

1    office as well, based upon reasonable suspicion of unlawful

2    conduct or a violation of a condition of supervision without a

3    search warrant.  The failure to submit to a search may be

4    grounds for revocation.

5            The defendant shall warn any other occupants of the

6    premises that they may be subject to search pursuant to this

7    condition.

8            Second, the defendant shall follow the rules and

9    regulations of the location monitoring -- excuse me.  She --

10   that's not applicable.

11           She shall participate in an outpatient mental health

12   treatment program and follow the rules and regulations of that

13   program.

14           The probation officer, in consultation with the

15   treatment provider, will supervise her participation in that

16   program.

17           Third, she shall not dispose of or otherwise dissipate

18   any of her assets until the fine and restitution ordered by

19   this Court is paid in full, unless she obtains prior approval

20   from the Court.

21           Fourth, she shall apply any and all moneys received

22   from income tax refunds, lottery winnings, inheritance,

23   judgments and any anticipated or unexpected financial gains to

24   any unpaid fine and restitution ordered by this Court.

25           Fifth, she shall provide the probation officer with

1    access to any requested financial information and authorize the

2    release of any financial information.  The probation officer

3    may share any financial information with the United States

4    Attorney's Office.

5          Sixth, she shall not incur any new lines of credit,

6    credit charges or open additional lines of credit without the

7    express approval of the probation officer.

8          Seventh, she shall make payments toward any unpaid

9    monetary penalty in this case while the supervised release is

10   pending at a rate of 10 percent of her gross monthly

11   payments -- income.  Excuse me -- gross monthly income.

12         The payments are to commence no later than 60 days

13   from placement on supervision.

14         The payment schedule does not prohibit the United

15   States from collecting, through any and all available means,

16   any criminal monetary penalty at any time, as prescribed by

17   law.

18         And finally, she must participate in a copayment plan

19   for treatment, testing and/or medication and shall make payment

20   directly to the vendor under the contract with the United

21   States Probation Office.  Her copayment will be determined

22   utilizing a sliding-fee scale, based upon her disposable

23   income.

24         Do you understand the conditions of supervision,

25   Ms. Papini?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And do you understand the sentence?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Mr. Portanova, are you asking the Court to

5     recommend a place of confinement?

6          MR. PORTANOVA:  Yes, Your Honor.  California.

7     Someplace this California, Your Honor.

8          THE COURT:  All right.  The Court will recommend that

9     Ms. Papini be incarcerated at an institution in California, but

10    only insofar as that recommendation accords with security

11    classification and space availability.

12         When do you suggest the Court order that she turn

13    herself in to serve the sentence?

14         MR. PORTANOVA:  I would recommend early November, Your

15    Honor.  It takes them quite a bit of time lately to designate.

16         THE COURT:  Ms. Alegria?

17         MS. ALEGRIA:  No objection, Your Honor.

18         THE COURT:  Early November.

19         The Court will order that Ms. Papini turn herself in

20    to the institution designated by the Bureau of Prisons by 2:00

21    p.m. on November the 8th.  Make a note of that, Mr. Portanova.

22         Ms. Papini, you keep in touch with Mr. Portanova.  He

23    will inform you what institution has been selected.  It will be

24    your responsibility to turn yourself into that institution.

25         If you don't want to turn yourself in to that

1  institution or if you can't get there, you're ordered to turn

2  yourself in to the United States Marshal's Office on the fifth

3  floor of this building at that time.  That is 2:00 p.m. on

4  November the 8th of this year.  Understood?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.  Has she waived her right to

7  appeal?

8          MS. ALEGRIA:  Yes, Your Honor.

9          MR. PORTANOVA:  Yes, Your Honor.

10         THE COURT:  All right.  Is there anything else at this

11 time, Mr. Portanova?

12         MR. PORTANOVA:  No, Your Honor.  Thank you for the

13 time.

14         And I know Ms. Papini, as painful as it is,

15 appreciates the Court's time and attention to this matter as

16 well, as well as the U.S. Attorney's Office.  As bad as this

17 is, it's -- I sincerely believe that she has accepted this in

18 her life completely and couldn't get there without the Court's

19 help and the U.S. Attorney.

20         THE COURT:  Is there anything else, Ms. Alegria?

21         MS. ALEGRIA:  Yes, Your Honor.  The government, in the

22 interest justice, moves to dismiss the remaining counts of the

23 information.

24         THE COURT:  That motion is granted.  The remaining

25 counts of the information as against Ms. Papini are dismissed.

1          All right.  Court will be in recess for 15 minutes

2    before we call the next case.

3          MR. PORTANOVA:  Thank you, Your Honor.

4          MS. ALEGRIA:  Thank you, Your Honor.

5        (Concluded at 9:47 a.m.)

6

7                    C E R T I F I C A T E

8

9      I certify that the foregoing is a true and correct

10   transcript of the record of proceedings in the above-entitled

11   matter.

12   _____        September 19, 2022

13   JENNIFER L. COULTHARD, RMR, CRR                DATE
     Official Court Reporter
14   CA CSR#14457

15

16

17

18

19

20

21

22

23

24

25